IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 1, 2021

**IN RE JORDYN H., ET AL.**

**Appeal from the Juvenile Court for Lauderdale County**
**No. J9-784      Rachel J. Jackson, Judge**

_____

**No. W2020-01618-COA-R3-PT**

_____

This appeal concerns the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Lauderdale County ("the Juvenile Court") seeking to terminate the parental rights of Erica H. ("Mother") to her minor twin sons, Jordyn and Jadyn H. ("the Children," collectively). After a hearing, the Juvenile Court entered an order terminating Mother's parental rights on a number of grounds. Mother appeals. We find, by clear and convincing evidence, that five grounds for termination were proven against Mother and that termination of Mother's parental rights is in the Children's best interest. However, we vacate certain of the grounds found by the Juvenile Court. We therefore affirm the Juvenile Court's judgment, as modified, terminating Mother's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed as Modified; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Lauren A. Raynor, Covington, Tennessee, for the appellant, Erica H.

Herbert H. Slatery, III, Attorney General and Reporter; and Lexie A. Ward, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

In March 2019, the Children were born prematurely.[1]  Based upon their in-utero drug exposure by Mother, the Children entered DCS custody.  Protective custody orders were entered to this effect.  Jadyn's urine and meconium results came back positive for cocaine.  Jordyn did not have enough urine for a drug screen; his meconium results were negative. Jadyn was discharged from the hospital on May 28, 2019. Jordyn was discharged on June 4, 2019.  The Children then entered their present foster home, where they have remained throughout the custodial episode.

In March 2020, the Juvenile Court adjudicated the Children victims of severe child abuse based on Mother's drug abuse and Jadyn testing positive for cocaine.  DCS moved for, and was granted, relief from having to provide reasonable efforts as it related to the Children.  Mother did not appeal the severe child abuse finding.  Mother was incarcerated from November 4, 2019 through November 14, 2019 on a violation of probation, the underlying charge for which was severe child abuse.  On March 16, 2020, DCS filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Children. DCS alleged a host of grounds, to wit: (1) abandonment by failure to visit; (2) abandonment by failure to support; (3) abandonment by wanton disregard (should the proof show that Mother was incarcerated during the four months prior to the filing of the petition); (4) abandonment by failure to establish a suitable home; (5) substantial non-compliance with the permanency plan; (6) persistent conditions; (7) severe child abuse; and (8) failure to manifest an ability and willingness to assume custody.  DCS also alleged that terminating Mother's parental rights would be in the Children's best interest.  Mother filed an answer in opposition.

This matter was tried in August 2020.  Veronica Gooch ("Gooch"), DCS Team Leader for Foster Care in Lauderdale, Haywood, and Hardeman Counties, testified first. Gooch supervised DCS worker Angel Ingram ("Ingram"), who had worked on the case but was then on maternity leave.  Gooch had reviewed the casefile before testifying.  Gooch was involved with the Children's case primarily in a supervisory role.  Gooch testified:

> The children entered custody due to drug exposure by the mother.  From my understanding, [Jadyn] tested positive in the hospital for cocaine, and [Jordyn] did not test positive because they didn't have enough urine to make

---

[1] No father was listed on the birth certificates.

the screening for him, but it was my understanding that the children entered due to drug exposure by the mother.

Mother was supposed to go to the Dream Center facility in Jackson, which was to take in both her and the Children. However, Mother failed to submit the proper paperwork. DCS attempted to find relatives who could assume custody of the Children. In particular, DCS reached out to the Children's maternal grandmother, but she was unable to assume custody. At the time, the maternal grandmother was living in a one-bedroom residence while caring for an older child of Mother's. Gooch then testified to Mother's responsibilities under her permanency plan:

> The responsibilities for [Mother] was to complete parenting classes. [Mother] was to complete alcohol -- it was to complete an alcohol and drug assessment and follow the recommendations. [Mother] was to have financial and residential stability. [Mother] was to have a mental health assessment, will maintain her mental health treatment with Dr. Osborne in Dyersburg and provide verifications. And she was to make the Department aware of the whereabouts of the father....

Gooch stated that, to her knowledge, Mother had not completed parenting classes. Gooch stated that Mother did not complete an alcohol and drug assessment. Gooch acknowledged, however, that Mother went to Buffalo Valley, a drug rehabilitation center. Mother spent a little less than a month there. Asked whether DCS was able to get any information regarding Mother's aftercare requirements, Gooch stated:

> No. When we attempted to get the recommendations from Buffalo Valley after she completed her 30-day program there, we were not able to because she had not signed a release of information, so when we attempted to call to get the recommendations, they would not give them to us due to privacy issues.

Gooch testified that as of that day of trial, she still did not have a release from Mother to obtain Mother's aftercare records. Gooch stated that on November 4, 2019, Mother tested positive for marijuana, cocaine, and morphine. Mother refused DCS's requests for drug screens upon her release from Buffalo Valley. Regarding Mother's housing situation, Gooch testified:

> To my knowledge, she is still homeless. She states that -- we'll ask her one time and she'll say that she lives with her mother. We'll ask her again, and she'll say that she's homeless. Her mother said she does not live there with

-3-

her because she only has a one bedroom apartment, and she's not on her lease, so she cannot stay there with her.

Mother never furnished Gooch with a residential lease or a residence on which to conduct a home study. Mother never provided any verification that she maintained her mental health treatment with Dr. Osborne. Gooch stated that pursuant to the Health Insurance Portability and Accountability Act, or "HIPAA," a signed release from Mother was required to access that information. Gooch then testified to the Children's health. Gooch stated that the Children suffered from certain developmental delays. Gooch elaborated:

I know that they were not meeting their developmental milestones on time. I know they're over a year old. They just started walking. Only started babbling or to talk maybe a few months ago. Couldn't sit up on time like they were supposed to be able to sit up at 5 or 6 months old. They were not able to do so without some assistance. Couldn't roll over when they were supposed to at the developmental milestone that they were supposed to. So, [Tennessee Early Intervention System] has been working with them doing physical therapy, and we were starting speech therapy for them as well through TEIS.

Gooch stated that once the Children reach age three, TEIS has to refer them to a school system or another provider. Returning to the permanency plan, Gooch stated that Mother signed it. On July 9, 2019, Mother signed the Criteria and Procedures for Termination of Parental Rights. The document also contained a signature by Ingram reflecting she explained its contents to Mother. Asked if there were other occasions when it was explained to Mother that her parental rights could be terminated for failure to comply with the permanency plan, Gooch testified:

Yes. When we had other permanency plans, she was made aware, via phone. The last one we just had was February. She was made aware via phone and when we made home visits to her mother's home, and she was there, we made her aware. We went over the permanency plan with her, and we made her aware that her rights could be terminated for not complying with the permanency plan.

When Gooch was asked to detail the services DCS provided for the Children and Mother in this case, Gooch responded:

Q. What services did the Department provide for the children and [Mother] in this case?

-4-

A. The Department assisted the mother with locating an A&D treatment facility, provided transportation, and completed the Tennessee Early Intervention referrals for the children.

Q. Now, when you say, "provided transportation," what type of transportation? Was this to visits with the children? Was this to visits to go to Buffalo Valley? What type of transportation? Would you just state on the record what you mean by that?

A. I provided transportation to [Mother] to take her to meet the bus to go to Buffalo Valley on the day that she went to Buffalo Valley. Ms. Angel transported her to different places that she needed to go to around Ripley. And she transported her, I do believe, to Here's Hope to find out about the counseling at Here's Hope as well.

Gooch stated that the Children had been in the same foster home since the beginning of the case. Regarding visitation, Gooch testified that Mother had only visited one of the Children, Jordyn, once when he was having tubes placed in his ears at the hospital; Mother was at the hospital to be with her daughter who was giving birth. Gooch stated that Mother had not contacted DCS seeking any additional visits with the Children. Gooch stated that Mother never sent the Children any birthday or Christmas cards. Gooch stated further that, to her knowledge, Mother never inquired as to the well-being of the Children. Gooch testified that Mother had incurred criminal charges the morning of trial for violation of probation. With respect to the foster parents, Gooch stated "they take excellent care of the children."

On cross-examination, Gooch stated that DCS did not furnish Mother with a bus ticket to get to Buffalo Valley. Gooch testified, however, that she provided Mother with transportation to get to the bus stop. Gooch also gave Mother food and waited with her. Asked if she was aware that Mother lacked transportation, Gooch stated that Mother's mother generally provided her with transportation. Gooch stated that if parents need transportation for a particular occasion, they have to ask for it. Gooch was asked about Mother's failure to sign a release for her medical records:

Q. While at Buffalo Valley, did [Mother] receive a psychological assessment?

A. I'm not aware exactly what she received. I requested myself the results of the aftercare for her at Buffalo Valley, and I was told that I would not -- they could not send it to me because [Mother] had not signed a release of information, and it was a violation of their policy.

Q. Okay. [Mother] didn't have to sign that release for you though, correct?

A. In order for me to get the information from Buffalo Valley, they would not release it without a release from [Mother].

Q. I understand that. But she has a personal right to keep her medical records private, correct?

A. Yes, ma'am; I guess she does.

Q. And then you stated that she was seeing Dr. Osborne in Dyersburg.

A. That's what she reported to us.

Q. Okay. And you requested information from there, and you also didn't receive a release.

A. No release was signed for us to obtain that information. This is -- [Mother] reported to us when she initially -- when the children initially came into custody, and we were able to make contact with her that she was seeing Dr. Osborne, but when we tried to obtain those records, there was no release signed for us to obtain those records.

Q. Your exact words were, "not from Dr. Osborne." Had she given you a release for anyone else?

A. Not to my knowledge. I'm not aware of a release that was signed by [Mother].

Gooch could not remember exactly how many drug screens Mother refused to take. Gooch stated that Mother refused a drug screen on September 12, 2019. Gooch stated that Mother also refused a drug screen in November 2019 before she was arrested. Gooch testified that submitting to random drug screens was one of Mother's responsibilities under her permanency plan.

On examination by the guardian ad litem, Gooch was asked whether Mother had cooperated with DCS. Gooch answered:

No, and when we attempt to discuss the permanency plan with her and try to get her to advise us the things that she's done or try to assist her with getting things to assist her with the permanency plan, she gets upset and hollers and screams and curses, and we're not able to assist her with that.

Gooch testified that she believed the Children would be much better served staying in their present home than ever returning to Mother's care.

Next to testify was Erin G. ("Foster Mother"), the Children's foster mother. Foster Mother was married and had three biological children. The Children had come directly from the hospital to Foster Mother's home. Foster Mother testified extensively to the Children's medical conditions. Foster Mother stated that things were difficult at first, "[b]ut [the Children] have grown so much. Always gaining weight and good reports from their doctors." Foster Mother stated that her older children "really do love [the Children] and help out and so, they're definitely a part of our family." Foster Mother stated that

Mother visited Jadyn in the hospital when he was having tubes put in, not Jordyn as Gooch testified. Foster Mother testified to Mother's visitation:

> When the babies first came into our home, at that time, there was no visitation set and so, we had been asked if we would be willing to speak with [Mother] once a week on -- by phone, that she could just call and talk and so, we talked once a week, and we would share photographs with her of the twins and also, that it came to my attention later that we were -- there were so many doctor's visits, but that to start making her aware of doctor's visits because she was permitted to come to those and so, I tried then to make sure to make her aware of doctor's visits that were coming up, if she would choose to come to those, but as that November date approached, I believe it was November the 3rd, right prior to that, perhaps in the week before, we were instructed by DCS to not have any more communication with [Mother] because that was just of our -- that wasn't a court mandated order. That was just something that we agreed to but that DCS was having difficulty having contact with her and so, they wanted the contact from their [sic] on to go through DCS between us and [Mother], but I had already made her aware of the visit or the appointment for the tubes to be put in in November. So, she already knew about that….

Foster Mother, describing her home, testified she has four bedrooms and three bathrooms. Foster Mother stated: "We truly feel that [the Children] are our children, and they're a part of our family, and we want what's best for them."

On cross-examination, Foster Mother stated that during her phone conversations with Mother, the latter would ask how the Children were doing. Foster Mother then elaborated on her earlier testimony that she was instructed by DCS not to speak with Mother:

> Q. Okay. And then you said prior to this or November 3rd, DCS instructed you not to speak with [Mother]?
> A. Well, like I said, the phone calls were never -- that was just if we were willing to do that, you know, in the time that I think there was hope that visitation eventually would be requested, but that never happened, and so, we were just talking with her, but my understanding was that she was not being compliant with DCS or working with them and so, they wanted her to communicate through them so that they could know what was going on and communicate because we were having regular communication but they were not able to have the communication that they were desiring with her.
> Q. And once again, who told you to stop communicating with the mother?

A. I honestly don't remember. I would think that it was Ms. Angel, but I couldn't say 100 percent, but I think it was probably Ms. Angel.

Q. Okay. And did they ever show you a no contact order or anything like that?

A. No. There was no, to my knowledge, there wasn't a no contact order, but my understanding, even from the beginning, was that we weren't required to do the phone calls because that wasn't a court -- that wasn't court ordered, that we were just willing to do that.

Q. Right. Okay. Would you have been willing to continue the phone calls, if DCS had told you -- had not told you to stop doing it?

A. Yeah, I mean, we were fine with doing that, but we understood why they were asking us not to, that made sense to us, that they were trying to have contact, and they were not able to establish that while we were having regular contact so.

Foster Mother testified that on Mother's one visit with Jadyn, Mother held him; changed his diaper; talked with Foster Mother; and was "very helpful and attentive."

On examination by the guardian ad litem, Foster Mother stated that on one occasion, Mother asked her if she were willing to meet some of Mother's family members. Foster Mother declined because "that wasn't through DCS…." Foster Mother stated that, to her knowledge, Mother never asked for visitation rights with the Children.

Mother was the final witness to testify. Mother stated that she did not go to the Dream Center to submit her information because she did not have transportation. Mother stated she asked for transportation, but she was told "they can't just drop everything they doing to do what I have to do." Mother testified she found out she was pregnant three months into her pregnancy with the Children. Mother had been using cocaine during that time. Mother stated that she stopped using cocaine after she found out she was pregnant. Mother stated that she then "slipped up" after giving birth. Mother went to visit the Children while they were in the hospital. Mother testified:

I went two or three times a week. Sometimes my transportation van would get messed up, but they would call up there and let them know it was they fault that, you know, and then I have to sign papers to go in there. I did a lot of visits. I even done spent the night in the waiting room.

After the Children were released from the hospital, Mother went to Buffalo Valley for a 28-day program. Mother said that after leaving Buffalo Valley in July 2019, she paid out-of-pocket for more rehabilitation in Nashville at a place called Footprints of Recovery. Mother stayed there for two weeks. Mother testified:

And I tried to get funding to stay, and I would call Ms. Angel or one of them. They wouldn't help me do nothing. They wouldn't even tell me like places I could get funding because I was paying out of my pocket. Wouldn't nobody give me no information or nothing like that. So, I had to go.

According to Mother, she started having phone calls with the foster parents around April of 2019. Mother called every Wednesday at 7:00 until she went to jail that November. Mother was incarcerated from November 4th through November 14th, 2019. Asked if she had requested visitation with the Children, Mother replied:

Yes, ma'am. And every time I asked, they would either send me to the next person or try to tell me to come to you or just tell me I have to talk to the judge. I don't -- what I supposed to come in and I don't know how to come in and ask for the judge. I didn't know how to do it, so but I did ask for visitation. Every time I talked to Ms. Angel or Ms. Gooch, or anybody, I asked about my, and when I was in rehab, [I] tried to get them to get my kids to see each other. That's what I meant when I -- when she said family. My family wanted to see. I wanted my kids to know they brothers. And I was in Nashville. And they didn't even do that.

Mother stated that she lives in an apartment with her son and her mother. Mother sometimes stays at her daughter's house, which is a two-bedroom house. Mother testified that she has a room large enough for toddler beds. Mother had stayed with her daughter for around one month. Mother receives $750 per month in Social Security disability income. According to Mother, she could have her name put on an apartment lease within a month's time. Asked why she did not complete parenting classes, Mother stated she was given the wrong date and then the COVID-19 pandemic began. Mother testified she underwent a drug and alcohol assessment at Buffalo Valley, and the only recommendation was to "go to group and read my big book." The "big book" was "like a alcoholic anonymous book." Mother stated she did not sign a release for DCS because she did not have one to sign and DCS never gave her one. Mother testified she completed a mental health assessment. Mother stated that she did not provide information regarding this mental health assessment to DCS because she did not know she had to. Mother testified, however, that she gave DCS her "rehab papers and stuff." Mother stated that she received a copy of her permanency plan only two months before trial and only after begging for it. Mother stated she no longer uses cocaine. DCS tried giving Mother random screens on three occasions. Mother stated that she submitted to two drug screens and refused one. Concluding this portion of her testimony, Mother stated that she loves the Children.

-9-

On cross-examination, Mother admitted that she was told she failed a drug test for morphine and marijuana in November. Asked if she refused any drug tests after that, Mother responded: "It wasn't really refusal. It was more of me being mad because they tried to trick me, and I wanted my lawyer around for any time they did that anymore, and I told her that." Mother testified that Foster Mother is a "real nice lady." Nevertheless, Mother testified that the Children would be better off with her rather than Foster Mother. Mother acknowledged that she lacked proper housing. Mother acknowledged that she had not completed parenting classes. Mother acknowledged not providing DCS with an alcohol and drug or mental health assessment. Mother stated: "I didn't know I was supposed to." Mother acknowledged further that the apartment she testified she lived in part of the time was a one-bedroom apartment and actually was her mother's address. Mother's mother lived there with one of Mother's older sons. Continuing her testimony, Mother stated that she had been arrested some time before trial for domestic assault. Mother was arrested on the day of trial for violation of probation in connection with this domestic assault charge. Mother stated that the domestic assault was with her daughter— specifically, the daughter Mother had stated she could live with after trial.

On re-direct examination, Mother testified that she had been prescribed and was taking Depakote, Doxin, and Hydroxyzine, all in accordance with the recommendations of her mental health assessment. Asked why she never told DCS about this, Mother stated: "I didn't know I was supposed to. I would have been glad to tell them. That would have been good on my part." Mother testified further that she had passed all of the drug screens administered through her probation services. After testifying, Mother submitted to a drug screen at the termination hearing. Mother tested positive for marijuana, opiates, and Tramadol. It was noted, however, that Mother stated she was prescribed Doxin, Hydroxyzine, Trileptal, and Lortab.

In October 2020, the Juvenile Court entered its final judgment. The Juvenile Court found, by clear and convincing evidence, that multiple grounds for termination of parental rights were proven against Mother, to wit: (1) abandonment by failure to visit;[2] (2) abandonment by failure to establish a suitable home; (3) abandonment by wanton disregard; (4) persistent conditions; (5) severe child abuse; and (6) failure to manifest an ability and willingness to assume custody. The Juvenile Court also found by clear and convincing evidence that termination of Mother's parental rights is in the Children's best interest. In its final judgment, the Juvenile Court found and held, in pertinent part:

---

[2] As we discuss further herein, there was some ambiguity as to whether the Juvenile Court found the ground of failure to visit, failure to visit by incarcerated parent, or both.

-10-

6. Per testimony and stipulated documentary evidence, admitted into the record (See Exhibits 4(a), (b)[,] (c), (e), and (j)[)], respectively, the Court finds as follows:

a. [In March 2019], the Department received a report regarding newborn twins, Jadyn [H.] and Jordyn [H.]. The report indicated that the children were drug exposed. The twins were born prematurely … at twenty-seven (27) weeks, four (4) days gestation.

b. The children's mother, [Mother], admitted to the use of cocaine. The Mother's urine drug screens on February 26, 2019 (a prenatal visit), March … 2019, April 12, 2019, and November 4, 2019 were positive for cocaine.

c. Jadyn's urine drug screen was positive for cocaine at birth; Jordyn was unable to be tested due to an insufficient amount of urine. Meconium results for Jadyn were positive for cocaine; Jordyn's meconium results were negative.

d. DCS Investigator Cook finally made contact with the children's mother, [Mother], on April 3, 2019. Several previous attempts to contact [Mother] had been unsuccessful. [Mother] reported that she was homeless, living from house to house and that she had been using cocaine for seven (7) months, including during her pregnancy with the twins.

e. However, it was noted on the termination hearing date that [Mother] stated she did not use cocaine during her pregnancy, but this statement contradicted [Mother's] statements to the DCS worker as set out above; as well, as the medical records which had been previously [entered] into evidence without objection on February 13, 2020. [Mother's] statement also was contrary to the prenatal records. The Court thus finds that [Mother's] testimony on this issue [was] not credible.

f. Also, on April 3, 2019, [Mother] declined a urine drug screen, and reported that the last time she had used cocaine was on March 31, 2019.

g. [Mother] indicated that she wanted help for her substance abuse, including rehabilitation treatment at an inpatient facility.

h. DCS made reasonable efforts to locate a rehabilitation facility for [Mother] near the twins, who were in the NICU at a Jackson, Tennessee hospital. Contact was made with Aspell Manor, Mother's Love, and The Dream Center. All these facilities were located in Jackson, Tennessee. The Dream Center would have accepted [Mother] and the twins upon their discharge; however, [Mother] failed to complete the necessary paperwork and interview process with the facility. Numerous attempts to contact [Mother] by phone for follow-up were unsuccessful. [Mother] indicated that her mother, Gladys [B.], was the only possible placement option and that she had no other family members. When Ms. [B.] was contacted, she stated that she indicated that she could not serve as a placement option for the children.

i. [Mother] testified that she attended Buffalo Valley rehabilitation program located in Jackson[,] Tennessee. She received a Psychological assessment and Alcohol and drug assessment at Buffalo Valley. She also received mental health treatment with Dr. Osborn in Dyersburg Tennessee and attended, but did not complete, Parenting classes. It was disputed that [Mother] made the Department aware of the tasks she had completed which were requirements of the permanency plan, but even viewed in the light most favorable to [Mother], she was not compliant with the permanency plan.

j. [Mother] also stated that she lives with her mother and is not homeless, but the proof at trial did not support this (see subsection "m", infra).

k. Medical records identified in Exhibit 4(j) without objection, also indicated that the Mother admitted to using cocaine approximately four (4) hours before she went into labor with the children.

1. Pursuant to Exhibit 4 (j), both children were assessed by Dr. Lisa Piercy. Dr. Piercy's assessment provided that both children were victims of "severe physical abuse, secondary to drug exposure."

m. Also, pursuant to Exhibit 4(j), the Mother had previously stated that she was homeless and did not have the appropriate supplies to care for the twins.

n. At the February 13, 2020 hearing, [the] Court found that the children, Jordyn and Jadyn [H.], suffered from abuse and/or neglect and therefore pursuant to T.C.A. § 37-1-129(a)(2) found that the children were victims of severe child abuse as defined at T.C.A. § 37-1-102(b)(27), perpetrated by their Mother, [Mother].

***

## A. ABANDONMENT: FAILURE TO VISIT AND FAILURE TO SUPPORT

16. The Court finds by clear and convincing evidence that the Respondent mother, [Mother], abandoned her children.

17. The Court finds, via testimony of the Department's witness and the record as a whole, that for a period of four (4) consecutive months immediately preceding the filing of this petition, the Respondent mother, [Mother], failed to visit her children.

18. Jadyn entered into the Department's custody on May 28, 2019. Jordyn entered the Department's custody on June 4, 2019.

19. During the fourteen (14) months that the children have been in DCS custody, other than some telephone calls to the foster parents to inquire about the children and one visit with one of the children when said child was receiving a medical treatment, the Respondent mother, [Mother], has not

visited with the children. The Court finds that [Mother's] actions amount to mere token visits.

20. The Court finds that the Respondent mother, [Mother], was aware of her duty to visit her children, and other than as set out above, she made no attempts to visit with her children and that she provided no justifiable excuse for her failure to visit.

21. The Court finds that the Respondent mother, [Mother], had been advised on July 9, 2019, that abandonment is a ground for the termination of parental rights. The record revealed that [Mother] signed the criteria of Termination of Parental Rights on July 9, 2019. [See Exhibit 4(f)].

22. Per documentary proof [Exhibit 4(j)], on February 13, 2020 the Department was relieved of reasonable efforts after a finding of severe abuse. Prior to being relieved of reasonable efforts, the Department made reasonable efforts to assist the Respondent mother, [Mother], in visiting the children including, but not limited to: attempting to maintain contact with the Mother and explaining to the Mother that in order to begin visitation with the children, she needed to make an appearance before the Court to assess her condition and safety issues for the children.

23. The record does not reveal that the Respondent mother, [Mother], ever made an appearance before the Court to request visitation with her children.

24. The Department pled in its Termination of Parental Rights Petition, that if the proof showed that the Respondent mother, [Mother], had been incarcerated for any amount of time during the four (4) months prior to the filing of the Petition, then the Department pled in the alternative that [Mother] abandoned the children by willful failure to visit the children for four (4) months preceding incarceration, and that she engaged in such conduct prior to incarceration as to exhibit a wanton disregard for the welfare of the children.

25. Proof at trial revealed that the Respondent mother, [Mother], had, in fact, been incarcerated from November 4-14, 2019. The Termination Petition was filed on March 16, 2020, which indicated that [Mother] had been incarcerated within four (4) months of the filing of said Petition.

26. The Court finds that other than the token visits set out above, the Respondent mother, [Mother], had not visited her children within four (4) months preceding her incarceration, and further found that she engaged in such conduct prior to incarceration as to exhibit a wanton disregard for the welfare of the children.

27. The Court finds that the Department had by clear and convincing evidence proven the ground of abandonment by failure to visit the children.

28. The Department withdrew the ground of abandonment by failure to support. As a result of withdrawing said ground, the Department did not prove that ground by clear and convincing evidence.

## B. ABANDONMENT: FAILURE TO ESTABLISH A SUITABLE HOME

29. The Court finds that on May 28, 2019 and June 4, 2019, respectively, the children were removed from the home of the Respondent mother, [Mother], and were thereafter adjudicated dependent and neglected by the Juvenile Court. The Juvenile Court found that the Department made reasonable efforts to prevent the removal of the children or that the circumstances of the children's situations prevented reasonable efforts from being made prior to the children's removal.
30. The Court finds that for a period of four (4) months following removal, the Department made reasonable efforts to assist the Respondent mother, [Mother], in establishing a suitable home for the children, but the Respondent mother's failure to make even minimal efforts to improve the home circumstances and her own personal conditions demonstrates a lack of concern for the children to such a degree that it appears unlikely that a suitable home will be provided by the Respondent mother at an early date.
31. The Court finds that the Respondent mother, [Mother], has not had stable housing during the pendency of this case. In fact, at one period of time, the Respondent mother acknowledged that she was homeless.
32. Therefore, the Court finds by clear and convincing evidence that the Respondent mother, [Mother], abandoned her children by the failure to establish suitable housing.

## C. CONDITIONS STILL EXIST THAT PREVENT RETURN

33. As stated earlier, the Court finds that on May 28, 2019 and June 4, 2019, respectively, that the children were removed from the home of the Respondent mother, [Mother], and were thereafter adjudicated dependent and neglected by the Juvenile Court. The Juvenile Court found that the Department made reasonable efforts to prevent removal of the children or that the circumstances of the children's situations prevented reasonable efforts from being made prior to the children's removal.
34. The Court finds that the children have been removed from the custody of the Respondent mother for more than six (6) months;
35. The Court finds that the conditions which led to the removal of the children from the home of the Respondent mother, [Mother], still exist and other conditions exist which in all probability would cause the children to be

subject to further abuse and/or neglect, making it unlikely that the children could be returned to the Respondent mother in the near future;

36. The Court finds that there is little likelihood that these conditions will be remedied at an early date so that the children can be returned to the Respondent mother, [Mother], in the near future; the continuation of the parent or guardian and child/ren relationship greatly diminishes the children's chance of an early integration into a stable and permanent home.

37. The conditions that prevent the children's return to the Respondent mother's home are the following:

a. The Respondent mother does not have residential stability and continues to reside with various friends and/or relatives.

b. On the hearing date, the Respondent mother stated that she resided at…. However, when cross-examined, the Respondent mother admitted that the … address was actually the address of her own mother (the children's maternal grandmother).

c. Furthermore, the maternal grandmother resides in a one-bedroom apartment with [Mother's] oldest son. There is not sufficient space in the maternal grandmother's home for the Respondent mother and the children who are the subject of this proceeding.

d. The Respondent mother then testified that she resided with her adult daughter, but was unable to provide the address of that residence. However, when cross examined, [Mother] admitted that she is not included on her daughter's lease as a resident. In fact, [Mother] and her adult daughter had been involved in a very recent altercation and that the Respondent mother had been arrested as a result of the altercation.

e. The Court does not find the Respondent mother, [Mother], credible on the issue of her residency.

f. The Respondent mother's only source of income is her disability check.

g. The Respondent mother did not complete parenting classes.

h. The Respondent mother did complete A&D treatment at Buffalo Valley; however, following treatment, tested positive for cocaine, opiates, and THC on November 4, 2019.

i. The Mother did not complete a mental health assessment.

j. The Respondent mother did not make her whereabouts regularly known or make herself available for drug screens.

k. The Respondent mother continues to test positive for illegal drugs and tested positive for THC and opiates on the termination hearing date.

l. The Respondent mother was arrested on the hearing date and housed at the Lauderdale County Correctional Facility.

38. The Department made reasonable efforts to assist in complying with the requirements in the permanency plan by providing and/or assisting with the

following, including but not limited to; the Respondent mother was provided information regarding housing and a location to complete parenting classes; the Respondent mother was provided information as to where to apply for financial assistance to obtain housing; the Respondent mother was transported to Here's Hope to complete an A&D assessment; and the Department administered random drug screens to the Respondent mother when she, on occasion, made her whereabouts known.

39. The requirements relative to the Respondent mother's sobriety and stability are particularly important in reducing the risk of harm to the children so that the children could be safely returned to the parent's care, given the mother's history on these issues and the children's vulnerable health conditions. The Respondent mother's compliance with A&D treatment is a critical step in her ability to demonstrate sobriety.

40. In addition, the Respondent mother continues to test positive for illegal drugs, having tested positive for marijuana on the hearing date. The Respondent mother continues to violate the law by engaging in a physical altercation with her adult child which resulted in her arrest (a short time prior to the termination hearing); and coupled with another arrest on the actual termination hearing date.

41. The Respondent mother continues not to have stable housing and is living from "pillar to post" with one relative after another.

42. As set out in Exhibit 4(j), the Respondent Mother does not have custody of her two other minor children, ….

43. Prior to being relieved of reasonable efforts, the Court finds that the Department made reasonable efforts to rectify the conditions that led to the children's removal.

44. The Court finds that the Department had met this ground of conditions that continue to exist (persistence of conditions) by clear and convincing evidence.

## D. SEVERE CHILD ABUSE

45. The children, Jordyn and Jadyn [H.] were prenatally exposed to cocaine.

46. As set out in Exhibit 4(j), based on the testimony and the exhibits, the Court found on the basis of clear and convincing evidence that [Mother] committed severe child abuse as defined by Tennessee Code Annotated § 37-1-102 against a child/ren who is/are the subject of this Petition or any sibling or half sibling of such child/ren or any child/ren residing temporarily or permanently in his/their home.

47. Pursuant to Exhibit 4 (j), both children were assessed by Dr. Lisa Piercy. Dr. Piercy's assessment provided that both children were victims of "severe physical abuse, secondary to drug exposure."

48. On February 13, 2020, the Juvenile Court of Lauderdale County, Tennessee found the above-named children, Jordyn and Jadyn [H.], to be the victims of severe child abuse as defined by § 37-1-102, perpetrated by the Mother, [Mother].

49. The Court finds that the prior finding of severe abuse was not appealed and is *res judicata*.

50. The Court finds that the Department met this ground of severe abuse by clear and convincing evidence.

## E. FAILURE TO MANIFEST ABILITY AND WILLINGNESS TO ASSUME CUSTODY

51. The Court finds by clear and convincing evidence that the Respondent mother, [Mother], the children's legal parent, failed to manifest, by act or omission, an ability or willingness to personally assume legal and physical custody or financial responsibility of the children, and placing the children in [Mother's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children.

52. The Court found that [Mother's] actions during the time that the children have been in custody were token visits. Specifically, other than some telephone calls to the foster parents to inquire about the children and one visit with one of the children, when said child was receiving a medical visit, [Mother] has not visited with the children.

53. [Mother] is not drug free and has not maintained her sobriety during the fourteen (14) months that the children have been in DCS custody.

54. [Mother] continues to test positive for cocaine and other illegal services [sic]. [Mother] tested positive for THC and opiates on the termination hearing date.

55. [Mother] continues to violate the law and to be incarcerated, so that she is not available to act as custodian for her children. [Mother] was incarcerated from November 4-14, 2020 [sic]. A short time prior to the termination hearing, [Mother] was arrested for a physical altercation with her adult daughter. Further, on the hearing date, [Mother] was arrested.

56. The Court found that [Mother's] instability of housing, her history of illegal drug use and substance abuse and her three (3) recent incarcerations, are indicators of her failure to manifest an ability or willingness to assume legal and physical custody or financial ability for these children.

57. The Court found that placing these children in [Mother's] legal or physical custody would pose a risk of substantial harm to the physical or psychological welfare of these children.

58. The Court found that the Department by clear and convincing [evidence] proved the ground of failure to manifest an ability and willingness to assume custody of her children.

## F. *SUBSTANTIAL NON-COMPLIANCE WITH THE PERMANENCY PLAN(S):*

59. The Department voluntarily dismissed this ground on the hearing date. Consequently, this ground was not met by clear and convincing evidence.

## BEST INTEREST

60. [Mother] has not made an adjustment of circumstances, conduct or conditions as to make it safe and in the children's best interest to be in the home of the parent.

61. [Mother] has not maintained regular visitation or other contact with the children. [Mother's] contact/visitation is token at best.

62. A meaningful relationship has not otherwise been established between the children and the Mother.

63. The Mother has not completed parenting classes.

64. The Mother did complete A&D treatment at Buffalo Valley however, following treatment, tested positive for cocaine, opiates, and THC on November 4, 2019.

65. The Mother has not completed a mental health assessment.

66. The Mother has not made her whereabouts regularly known or made herself available for drug screens.

67. [Mother] continues to test positive for illegal drugs and tested positive for THC and opiates on the termination hearing date.

68. The children, Jadyn and Jordyn, are victims of severe abuse perpetrated by [their] Mother. The basis of the severe abuse finding was that the children tested positive for and/or were exposed prenatally to cocaine.

69. [Mother] continues to violate the law. [Mother] was incarcerated from November 4-14, 2020 [sic]. A short time prior to the hearing, [Mother] was arrested for a physical altercation with her adult daughter. Further, on the hearing date, [Mother] was arrested.

70. The Mother does not have stable housing and continues to live with various relatives.

71. [Mother] has not manifested an ability or willingness to assume the legal and physical custody of the children.

72. The Court found that placing these children in the Mother's legal or physical custody would pose a risk of substantial harm to the physical or psychological welfare of these children.

73. The children are placed in a foster home where the foster parents are bonded with the children, capable of providing for their physical, mental, and emotional welfare, and wish to adopt the children.

74. The children have established a strong bond with the foster parents.

75. The foster parent "roomed in" with the children in the NICU prior to their discharge from the hospital. The children were discharged from the hospital in the foster parents' care and have remained continuously in their care since that time.

76. The foster parents are the only parents that these children know.

77. The record is clear that DCS made reasonable efforts in this case.

78. The Court thus finds by clear and convincing evidence that it is in the best interests of the above children that the Termination of Parental Rights Petition is granted/sustained as to the Respondent.

79. The Guardian Ad Litem agreed that the Termination of Parental Rights is in the children's best interests.

Mother timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Mother raises the following issues on appeal: 1) whether the Juvenile Court erred in finding each of the grounds it found for termination of Mother's parental rights by the standard of clear and convincing evidence; and 2) whether the Juvenile Court erred in finding, also by the standard of clear and convincing evidence, that termination of Mother's parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v.*

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or

*Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these

---

the law of the land."

-20-

factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in

parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

In her first issue on appeal, Mother ostensibly challenges each of the grounds found against her. However, in the argument section of her appellate brief, Mother only specifically challenges the ground of persistent conditions. The Tennessee Supreme Court has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, in accordance with the Tennessee Supreme Court's holding in *In re Carrington H.*, we will review each of the grounds found against Mother, whether she specifically argues them or not. We note further that two grounds originally pled by DCS— abandonment by failure to support and substantial noncompliance with the permanency plan—were voluntarily withdrawn by DCS.

On March 16, 2020, when DCS filed its petition against Mother, the relevant grounds for termination of parental rights were set out by statute as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

\*\*\*

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
    (i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

(4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child;

\*\*\*

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child;

Tenn. Code Ann. § 36-1-113(g) (West March 6, 2020 to April 21, 2021).

In addition, the applicable definitions of abandonment were set out by statute as follows:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child

-24-

was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

\*\*\*

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

(*a*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

(*b*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or

(*c*) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; …

\*\*\*

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

\*\*\*

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

\*\*\*

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

Tenn. Code Ann. § 36-1-102(1) (West March 6, 2020 to June 30, 2021).

We first address whether the Juvenile Court erred in finding the ground of abandonment by wanton disregard. DCS concedes that this ground was found in error. DCS filed its petition against Mother on March 16, 2020. Prior to the filing date, Mother was incarcerated from November 4, 2019 through November 14, 2019. The pertinent window of time for this ground was November 16, 2019 through March 15, 2020. *See In re Jacob C.H.*, No. E2013-00587-COA-R3-PT, 2014 WL 689085, at \*6 (Tenn. Ct. App. Feb. 20, 2014), *no appl. perm. appeal filed* ("[T]he applicable four month window ... includes the four months preceding the day the petition ... is filed but excludes the day the petition is filed."). Because Mother was not incarcerated during the four months immediately preceding the filing of DCS's petition, the ground of abandonment by wanton disregard is inapplicable; the Juvenile Court erred in finding it was proven by clear and convincing evidence. We, therefore, vacate the ground of abandonment by wanton disregard.

We next address whether the Juvenile Court erred in finding the ground of abandonment by failure to visit. In its final judgment, the Juvenile Court appeared to find both the grounds of failure to visit and failure to visit by an incarcerated parent.[6] One or the other type of failure to visit may apply, but not both. As discussed above in relation to the ground of abandonment by wanton disregard, Mother was not incarcerated during the four months immediately preceding the filing of DCS's petition. The grounds found at Tenn. Code Ann. § 36-1-102(1)(A)(iv) for incarcerated parents simply do not apply in this case to Mother. We, therefore, vacate the ground of failure to visit by incarcerated parent.

DCS argues nevertheless that the ground of failure to visit, as found at Tenn. Code Ann. § 36-1-102(1)(A)(i), should be upheld because the evidence reflects that Mother failed to visit the Children during the four months preceding the filing of the petition. Mother's permanency plan called for supervised visitation. The Juvenile Court found that Mother never appeared before it to request visitation. While Mother asserts that DCS unilaterally determined after a point that Mother could not visit the Children, the evidence reflects instead that Mother failed to take any action to set up a visitation regime. Mother was not barred outright from visiting the Children; she simply did not pursue visitation. In addition, the Juvenile Court found that the visitation Mother did engage in amounted to mere token visitation. The evidence does not preponderate against the Juvenile Court's findings relative to this ground. We find, as did the Juvenile Court, that the ground of failure to visit—as found at Tenn. Code Ann. § 36-1-102(1)(A)(i)—was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of abandonment by failure to establish a suitable home. Jadyn was removed from Mother's custody on May 28, 2019; Jordyn was removed on June 4, 2019. The Children entered DCS custody and were found dependent and neglected. The Juvenile Court found that DCS made reasonable efforts to prevent removal and to assist Mother in establishing a suitable home for the Children. The Juvenile Court found that Mother, on the other hand, failed to make even "minimal efforts" to improve her home circumstances. The Juvenile Court found further that Mother's "own personal conditions demonstrates a lack of concern for the children to such a degree that it appears unlikely that a suitable home will be provided by the Respondent mother at an early date." The evidence does not preponderate against these findings. We find, as did the Juvenile Court, that the ground of abandonment by failure to establish a suitable home was proven by clear and convincing evidence.

---

[6] The Juvenile Court stated at one point in its final judgment: "For a period of four (4) consecutive months immediately preceding the filing of this petition, the Mother has failed to visit the children and/or that the one visit with one of the children during a medical visit was a token visit." Elsewhere, the Juvenile Court stated: "[Mother] was incarcerated on November 4-14, 2019, said dates of incarceration are within the four months preceding filing of this petition. Other than the token visit set out above, [Mother] abandoned the children by the willful failure to visit the children for four (4) months preceding incarceration…."

We next address whether the Juvenile Court erred in finding the ground of persistent conditions. Jadyn and Jordyn were removed from Mother's custody on May 28, 2019 and June 4, 2019, respectively. DCS filed its termination petition on March 16, 2020. The termination hearing was held on August 10, 2020, more than six months after the Children's removal. To reiterate, the Children entered DCS custody on the basis of drug exposure by Mother, specifically cocaine. Regrettably, Mother's abuse of drugs has persisted over the custodial episode. Mother continued to abuse drugs after participating in rehabilitation programs. Mother used cocaine while pregnant with the Children; used cocaine on the day she gave birth to the Children; and tested positive for cocaine as late as November of 2019. On the day of the termination hearing, Mother tested positive for THC. Mother's drug abuse never abated. In addition, Mother's lack of suitable housing is another condition likely to lead to further abuse and neglect of the Children. Mother has no stable housing. Indeed, Mother was arrested on the day of the termination hearing for violation of probation based upon an altercation with her daughter, the same daughter she stated she could live with after the hearing. The record contains no hint that Mother will be in a position to safely parent the Children any time soon. Meanwhile, the evidence reflects that the Children are thriving in their foster home, which they have lived in since they were discharged from the hospital. The evidence does not preponderate against the Juvenile Court's findings as to this ground. We find, as did the Juvenile Court, that the ground of persistent conditions was proven by clear and convincing evidence.

Continuing our review of grounds for termination, we next address whether the Juvenile Court erred in finding the ground of severe child abuse. We have previously determined that a prior finding by a juvenile court in dependency and neglect proceedings can be *res judicata* in parental rights termination proceedings. *See In re Dakota C.R.*, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012). In those cases, the doctrine of *res judicata* prevents the issue from being re-litigated in the subsequent parental rights termination proceeding. *Id*. In March 2020, the Juvenile Court entered an order finding that the Children were victims of severe child abuse perpetrated by Mother as defined at Tenn. Code Ann. § 37-1-102(b)(27). The record contains no evidence that Mother ever appealed the finding of severe child abuse. Mother did not challenge the finality or validity of the order finding severe child abuse either in the proceedings below or on appeal. *Res judicata* thus applies to this ground. In view of these facts, we find, as did the Juvenile Court, that the ground of severe child abuse was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. With respect to this ground, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d

-28-

659, 677 (Tenn. 2020) (emphasis in original, citation omitted). The second prong of the statute requires us to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Here, the Juvenile Court found that Mother manifested neither the ability nor the willingness to assume custody of the Children. The record bolsters this finding. Mother failed to visit the Children or request visitation; continued to abuse drugs; never obtained suitable housing; and continued to incur criminal charges. Mother's actions and inactions show both an unwillingness and inability to assume custody of the Children. The Juvenile Court found further that placing the Children in Mother's legal or physical custody would pose a risk of substantial harm to the physical or psychological welfare of the Children. This finding, too, is well-supported, as the record reflects that the Children are thriving in their foster home while Mother continues to struggle with her longstanding issues relating to drugs and housing. The danger to the Children were they to be removed from their stable environment and placed in Mother's care is manifest. The evidence does not preponderate against the Juvenile Court's findings with respect to either prong of this ground. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Children's best interest. When DCS filed its petition on March 16, 2020, the statutory best interest factors read as follows:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or

psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (West March 6, 2020 to April 21, 2021).

With regard to making a determination concerning a child's best interest, the Tennessee Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

-30-

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

Unfortunately, Mother's circumstances did not materially improve over the course of the custodial episode. Indeed, Mother was arrested for a violation of probation on the day of the termination hearing in connection with a violent altercation with her daughter (whose home Mother had identified as a suitable home for the Children), all the while testing positive for THC in court. The Juvenile Court made findings corresponding to best interest factors (1)-(8).[7] The evidence does not preponderate against any of the Juvenile Court's findings relative to the Children's best interest. Mother has an unresolved drug issue; lacks suitable housing; and has continued to incur criminal charges. Mother did not try to establish visitation with the Children; she has no meaningful relationship with the Children. Mother effectively is a stranger to the Children. Perhaps most significantly, the Children are victims of severe child abuse perpetrated by Mother. The Children are now recovering in their foster home after this inauspicious start to life at the hands of Mother.

---

[7] With respect to factor (9) concerning child support, Mother's payment or non-payment of child support consistent with the Guidelines was not made an issue, and DCS withdrew the ground of failure to support. The evidence reflects that Mother draws a Social Security disability check. At best, this particular factor is non-applicable; it certainly does not weigh in favor of preserving Mother's parental rights to the Children. Nevertheless, we are satisfied the Juvenile Court considered all of the statutory factors and all of the proof before it as to the Children's best interest.

The Children need and deserve permanency. Mother's ongoing, persistent issues reflect that it is highly unlikely the Children could achieve that permanency with her. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed as modified, the result of which being we affirm the termination of Erica H.'s parental rights. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Erica H., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE